Filed 5/5/23  P. v. Walker CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B314597 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA466200) |
| v. | |
| KEITH ALAN WALKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed in part and reversed in part.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

The jury found Keith Alan Walker guilty of two counts of first degree murder for the killing of Clifford Benton and Warner Stern (Pen. Code,[1] § 187, subd. (a); counts 1 & 2), four counts of assault with a semiautomatic weapon (§ 245, subd. (b); counts 3–6), and one count of felon in possession of a firearm (§ 29800, subd. (a)(1); count 8).[2]

With respect to counts 1 and 2, the jury found true the special circumstances that Walker was an active participant in a criminal street gang when he committed the murders (§ 190.2, subd. (a)(22)), and the allegations that Walker committed the murders for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury also found true the special circumstance that Walker committed multiple murders in both counts. (§ 190.2, subd. (a)(3).) With respect to Benton's murder (count 1), the jury found that Walker personally discharged a firearm causing death. (§ 12022.53, subd. (d).) As to Stern's murder (count 2), the jury found that Walker personally and intentionally discharged a firearm. (§ 12022.53, subd. (c).) With respect to counts 3 through 6, the jury found true the allegations that Walker committed the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)), and that he personally used a firearm in the commission of the crimes (§ 12022.5, subd. (a)). The jury found that the crime in count 8 was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(A).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Count 7 was alleged only as to codefendant Kejuan Moore, who was tried separately. Walker was tried with codefendant Chaz Maxwell. The jury acquitted Maxwell on all counts.

Walker admitted that he had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a), and the "Three Strikes" law.

In count 1, the court imposed a term of life without the possibility of parole, with consecutive terms of 25 years to life for the firearm enhancement and five years for the prior prison term enhancement, but stayed imposition of the attached gang enhancement. In count 2, the court imposed a term of life without the possibility of parole, with consecutive terms of 20 years for the firearm enhancement and five years for the prior prison term enhancement, and again stayed imposition of the attached gang enhancement. Walker was sentenced to four consecutive terms of four years in counts 3 through 6 (one-third the middle term of six years, doubled pursuant to the Three Strikes law), but the court stayed all enhancements attached to those counts. In count 8, the court imposed a concurrent high term of three years, and stayed imposition of the gang enhancement.

On appeal, Walker contends: (1) the trial court erred in ruling that the prosecutor's peremptory challenges to two prospective jurors were race-neutral; (2) recently-enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) requires reversal of the gang enhancements (amended § 186.22) and convictions (new § 1109); (3) the trial court erred by refusing to instruct on third party culpability; (4) the prosecutor committed misconduct in closing argument; and (5) the court made various sentencing errors. The People challenge these contentions. The People also argue that the abstract of judgment must be amended to reflect the murder conviction in count 2, which was omitted in error.

We affirm Walker's convictions. We reverse the true findings on the gang allegations (§ 186.22, subd. (b); counts 1–6 & 8) and the active participant in a criminal street gang special circumstance allegations (§ 190.2, subd. (a)(22); counts 1 & 2), and remand the matter to the trial court to afford the prosecution an opportunity to retry the gang allegations and gang participation special circumstance allegations under current law. If the People do not retry the allegations, the court is instructed to resentence Walker on the remaining counts and enhancements. In either case, the trial court shall insure the abstract of judgment properly reflects that the jury found Walker guilty of murder in count 2.

## FACTS

### *The Offenses*

At approximately 1:50 a.m. on October 15, 2017, Walker and several other members of the Rollin' Hundreds Neighborhood Crips (Rollin' 100's) street gang were injured in a shooting incident that resulted in a car crash.

Sometime after 2:00 a.m., Walker called fellow Rollin' 100's member Raivonn Dampeer and told him Scott Hutchins (aka Baby Killa) had just been shot. Walker said he was in the car with Hutchins and other Rollin' 100's members when someone shot at the car. Walker asked Dampeer to meet him at the hospital.

Dampeer met with Walker and Rollin' 100's members Moore (aka Lil Kill Shot), Christopher Wheeler, Maxwell,

Keyvonta Gordon, Jesse Fuller (aka Hank), and "Uzi" in the hospital parking lot.

Fuller and Gordon "ran the hood." Fuller told the group that "just based on Baby Killer had got shot, that we was going to have to go back to the enemies territory, Eight Treys, and go kill something."[3] By something, Fuller meant *someone*. The group caravanned to "Steve O.'s" house in Rollin' 100's territory to discuss what had happened and what they planned to do.

Fuller told everyone they were going to "slide on [their] enemies," which meant they would shoot their enemies. It was decided that Walker and Moore were going to be the shooters. Fuller designated Maxwell's black Audi A7 as the lead car, followed by Wheeler's burgundy Nissan Maxima, and Dampeer's silver Honda Accord. Walker had a gun with him. Moore grabbed a "neighborhood gun" that was stashed in the alley. Fuller said they needed to pick up females, so Dampeer picked up "Lady Toon" and "Little Lady Blue Flame" and brought them to Steve O.'s house.

After Dampeer returned, the cars left together, with Maxwell's car in the lead, then Wheeler's car, followed by Dampeer's vehicle. "Lady Thump" drove the black Audi, with Maxwell, Uzi, and Walker as passengers. Walker was in the back seat. Wheeler, Gordon, and Moore rode together in the red Nissan, with Wheeler driving and Moore in the back seat. Dampeer's silver Accord was a decoy car to distract police if they were pursued.

---

[3] The Eight Trey Gangster Crips (Eight Trey) are the Rollin' 100's biggest rival. Eight Trey claimed the area where the Rollin' 100's were shot.

The group thought the Gardena Payback Crips, who are an enemy of the Rollin' 100's, might have been responsible for the shooting. They went to Gardena Payback Crips territory first, but no one was outside, so Maxwell (with Lady Thump driving) led them into Eight Trey territory.

They drove to 77th and St. Andrews Place, where they saw three men smoking weed, and then stopped the cars at the corner. Two of the men were wearing royal blue, which signified that they were likely gangsters. Dampeer recognized one or two of the men from an incident that occurred at the county building on hood day.[4]

At the corner, Walker got out of the Audi and Moore got out of the Nissan. They ran back toward the three men that they had driven past. Walker and Moore were running fast with guns in their hands. Dampeer lost sight of them, but he heard numerous gunshots about six seconds later.

Assault victims Brandon Gray, Deric Jackson, and Walter Brown were walking on St. Andrews Place between 77th Street and 78th Street in Eight Trey territory about 11:30 a.m. on the day of the shooting. They were on the sidewalk in front of a house where three older men, including murder victims Stern and Benton and assault victim Richard Skaggs, were sitting on chairs eating barbeque together.

Two or three cars that appeared to be following each other passed Gray, Jackson, and Brown traveling north. Jackson could see the outline of three heads in the "middle car," which was a grayish color. The people in the middle car had their windows rolled down and were staring at Jackson and his friends. The

---

[4] The Rollin' 100's hood day is October 10th.

cars turned east at the corner.  Gray and Jackson followed the cars, but Brown stayed behind on the sidewalk.

As Gray and Jackson approached the corner, two men began running towards them.  Jackson recognized one of the men as a passenger from the middle vehicle.  Jackson "knew what they was coming for" because he saw one of the men reach into his waistband for a gun.  One or both of the men yelled "Fuck Tramps!"[5]  Gray, Jackson, and Brown heard multiple gunshots and fled.  As he was running, Jackson looked back and saw the man he had seen with the gun stop at the garage where the older men had been eating barbeque.  Jackson then heard approximately seven gunshots.

Alvenus Neptune, Benton, Stern, Skaggs, and a man called "Danny Boy," were barbequing when they heard gunshots.  They ran to try to find places to hide.  Neptune saw two men run past, followed by another two men who were walking and shooting guns. The taller of the shooters shot at Stern twice.  The other man shot Benton five times.  Benton raised his hands and said, "No man, no man," before the shooter shot him.  Someone shot Skaggs in the arm.  As they walked away, the tall shooter repeatedly directed expletives at the victims.  Neptune believed the shooting was "a hit" because the shooters walked together, shot together, and then "walked off like they ain't done nothing." The shooters walked back to the corner and turned right onto 77th Street.

After the gunshots stopped, Dampeer saw Walker and Moore run back and get into the cars they had been in before.

---

[5] Tramps is a derogatory word for Eight Trey gang members.

7

The cars left in the same order in which they had arrived, and went back to Steve O.'s house.

Subsequently, both Benton and Stern were determined to have died of multiple gunshot wounds.

### *Additional Evidence*

#### <u>Body Camera Footage</u>

An audio and video recording was obtained from a police officer's body camera at the scene of the shooting/car crash on October 15, 2017 in which Hutchins and other Rollin' 100's members were injured. Walker appears on the recording and can be heard on a cell phone call telling someone: "Hey, hey, Baby Killa just got shot, cuz. . . . [¶] Yep, the homies just got shot. . . . Infant Trigg got shot too. A lot of homies just got shot . . . . [¶] . . . Homegirl got shot. Yeah. We—we just all in the car together just now, but then pull up on the side of us. Yeah. [¶] Yeah. Nine—92. And they shot the homies. But I don't really bring it up. You know what I mean? [¶] And just provide the shit, and we gonna do what we got to do. Just bring some shit. Trust me. No, I don't— (End)."

#### <u>Witnesses</u>

##### *Gray*

Los Angeles Police Department Detective John Flores interviewed Gray at the police station on the day of the shootings. Gray described the shooter he saw at the corner as "heavy-set."

The heavyset man started shooting at them first. The heavyset man had been in the front passenger seat of an older gray Honda, and the other man was in the back seat behind the driver.

The heavyset man was about five feet eight or nine inches tall and weighed between 240 and 280 pounds. He had "chubby cheeks," and his skin tone was lighter than Gray's. Gray thought the heavyset man looked like someone he had seen before at the county building that was located in Rollin' 100's territory on hood day. The man had designs related to the Rollin' 100's on his head. He was with a friend and "being ghetto."

The second shooter was a little shorter than the heavyset man. He was also heavy, had a similar skin tone, and his hair was nappy.

The heavyset man's gun was black and appeared to be a Smith and Wesson .45 millimeter. The other man's gun was a .9 millimeter. The heavyset man said, "Fuck Tramps." Gray and his friends did not "gangbang."

Detective Flores showed Gray a photographic six-pack including Dampeer, but Gray did not identify Dampeer as someone involved in the shooting.

*Brown*

The detective also interviewed Brown on the day of the shootings. Brown included a few details that he could not later recall at trial. He stated that he and his friends were talking to the older men on St. Andrews Place when he noticed a gray 2000 Honda Accord driving by with three people inside who were looking at them. Brown commented to his friends, "Y'all see them looking? Y'all see them? They look kind of suspicious."

*Andrew McPherson*

On the day of the shooting, McPherson heard six to seven gunshots coming from the corner of 77th Streat and St. Andrews Place. McPherson had noticed a red car stopped near 1858 77th Street about three to five minutes earlier. He went out on his porch after hearing the shots and saw two young men running. The men came from St. Andrews Place heading north, turned east on 77th Street, and got into the red car. One man got into the front passenger seat, and the other man got into the back. McPherson did not see the driver.

*Dampeer*

In December 2020, after Walker, Moore, Wheeler, Maxwell, and Dampeer were charged in this case, Dampeer entered into a plea agreement with the prosecution. Dampeer pleaded guilty to two counts of voluntary manslaughter and was sentenced to 15 years in state prison. He testified for the prosecution in Walker's trial.

Dampeer joined the Rollin' 100's when he was 18 years old. Walker and Maxwell were also members of the Rollin' 100's. Dampeer's gang moniker was T-Loc. He was named "under" Big T-Loc. Dampeer explained the moniker prefix indicates the member's place in the hierarchy: Big, little, baby, tiny, and infant. In gang culture if your big homie gets shot, you shoot for him. Walker's moniker was Infant Killer, under "[a]ll the killers from big to tiny," including Baby Killa, which was Hutchins's moniker. Moore (aka Little Killshot) was also under Hutchins whose other moniker was Big Killshot. Maxwell's moniker was

Baby Knuckles or K3.  They identified as Block Crip, and Eight Trey was their enemy.

After the shootings, Dampeer heard Fuller say to Walker, "Oh, you niggas did some weird shit, y'all killed some old man." (9RT 4510)~ Walker replied, "Fuck them niggas, they live in the Tramps anyway."

Moore admitted to Dampeer that he shot the old men and said, " Cuz on Block Crip we did."  "Whoopty, whoopty, woo," which meant "who gives a fuck."  Moore said he saw Walker kill one of the men and then decided to shoot with him.  Moore said, "Cuz, I did my shit on both of them," meaning he and Walker killed the two men.

Maxwell asked Dampeer to drive behind him as a decoy so Maxwell could dispose of the gun, but Dampeer refused because he knew it was the murder weapon.  Maxwell later told Dampeer that he got rid of the gun at the Santa Monica Pier.

Sometime before his arrest, Dampeer was in an accident and totaled his car.  Wheeler told Dampeer that he sold his car.

Dampeer was not truthful with the detectives when he was first arrested, but he spoke with his grandmother on the phone several times and decided to tell the truth.  The detectives told Dampeer that they could not offer him anything at that time, but Dampeer decided to be honest.

Dampeer had concerns about testifying because Walker had asked him not to testify and then threatened him that he still had "pull on the streets [and] . . . can get whatever done that [he] need[ed] to get done."

## Vehicles Involved in the Shooting

Officers canvassed the area and identified the vehicles involved in the crimes from several surveillance videos that showed three cars—a black Audi A7, a red Nissan with a black bumper, and an older gray Honda Accord—traveling together at a high rate of speed between 11:15 a.m. and 11:30 a.m. on the day of the shootings.

Detective Flores conducted a traffic stop of a gray Honda Accord on September 8, 2017. A photo of the stop showed that Dampeer was the driver. After Dampeer was arrested, a photo of the gray Honda Accord was found on his phone.

Los Angeles Police Officer Mark Rakitis conducted a traffic stop of a red Nissan Altima on October 28, 2017. Wheeler was the driver, and the car was stopped in Rollin' 100's territory. Surveillance and body camera video of the traffic stop depicted Fuller exiting the front passenger side door. Basim Freeman and Leodis Johnson were adjacent to the car. Wheeler and Johnson had gang-related tattoos.

At trial, the parties stipulated that the black Audi A7 belonged to Maxwell. Surveillance video from a strip mall depicted Dampeer and Maxwell interacting on October 23, 2017. They left the mall together in the black Audi.

## Jail Calls

On November 1, 2017, Walker, who was detained in another matter, spoke with Hutchins in a recorded jail call. Walker told Hutchins, "I made it look good for you." Hutchins responded, "You made it look good for yourself, nigga. What the

12

fuck you talking about you made it look good for me? I went to the hospital." Walker said, "Me and that nigga [Moore], cuz. That nigga went up for the—you know?" Hutchins said he knew. He was interrupted by an automated operator advising him that the call was being monitored and recorded. Hutchins continued, "You don't even need to talk about it over the thing, bro. Later, Hutchins again warned Walker, "Like—I said, you gotta watch what you be doing and saying sometimes. Like, your ass is over there talking in front of the police when the shit happened and all that." Walker explained that he was angry at what happened. Walker told Hutchins that a person called Gedasee told Fuller that he wasn't giving him any guns "that night." Hutchins again reminded Walker that the call was monitored and recorded.

On February 1, 2018, when Walker was incarcerated in another matter, detectives questioned him about the shooting of the Rollin' 100's around 1:50 a.m. on October 15, 2017. They showed him a photo of Moore. In Walker's next phone call he asked a person named Kiara to get in touch with "Two Face" and tell him to "lay low." Walker said he did not want to say the person's name "because they watching me right now, cuz, they just came and interviewed me and shit."

In another jail call, Walker gave the person he was speaking with Moore's phone number. Investigators traced the number to an account opened by Moore on October 18, 2017.

**Social Media and Cell Phone Evidence**

Moore had a conversation with "Princess Trin" (Trin) on his Facebook account at 3:00 a.m. on October 15, 2017. Trin asked what was wrong and Moore answered, "Big Ks got hit, cuhk I'm

13

trippin.' " They talked about Hutchins being in the hospital. Moore then said that the "homies" were on their way right now. Moore wrote, "[P]ray somebody gonna die. I ain't Killshot #2K for no reason bcg."

In a Facebook conversation at 4:24 a.m. on October 15, 2017, Moore wrote, "The homies got shot." "Cuhk, I'm trippin' my bh, the one who name I got, is one of them, Rollin' Crip." "Fuck all at. Somebody gone die bcg."

Moore and Trin had a conversation on Facebook at 5:25 a.m. on October 15, 2017. Trin asked what Moore was doing that day and Moore responded, "shoot shit." Trin responded, "[S]top tellin' on yoself," and Moore answered, "Don't care."

Moore's Facebook and Instagram accounts contained photos of him with Wheeler, Freeman, and Walker.

Maxwell's Instagram account included a video of him that was uploaded on April 23, 2017, rapping in front of a wall with the graffiti "Welcome to the Hundred's" written on it. Dampeer was in the video wearing a gray hoodie, and Walker and a woman appeared in the video holding guns. A photo of Hutchins was uploaded on Maxwell's Instagram account on October 24, 2017.

Walker's Instagram account included a photo of Walker and Moore throwing gang signs in which Moore appeared to be much taller than Walker.

Hutchins's social media accounts included a post of him in a hospital bed with a neck injury. There was also a photo of Hutchins and Walker.

Fuller's Facebook account listed him under the name Hank Fuller. There were photos posted of Fuller throwing gang signs with Wheeler, Maxwell, and Moore. In a Facebook conversation on October 15, 2017, Fuller wrote "Baby Killer got shot twice in

14

the neck." Fuller listed "Baby Killa, Lady Blxoctober, Infant Triggs, and Cragg" as people who were shot.

On October 15, 2017, between 1:53 a.m. and 2:27 a.m., Walker's cell phone communicated with cell sites in the area of the car crash/shooting incident. Later that day at 11:22 a.m., Moore's cell phone was in the area of the crime scene on 77th Street. Between 1:00 a.m. and 12:00 p.m, Walker's cell phone communicated with Gordon's cell phone 10 times, with Moore's cell phone nine times, with Dampeer's cell phone seven times, and with Fuller's cell phone once. Cell phone records showed communications between other Rollin' 100's members who were allegedly involved in the offenses during the same time period.

### Wheeler's Statements to an Undercover Agent

On March 8, 2018, Moore, Wheeler, Dampeer, and Maxwell were arrested. Detective Flores put Wheeler in a cell with an undercover agent and recorded their conversations.

Detective Flores arranged to have Moore walk by Wheeler's holding cell. As he did, Wheeler whispered to the agent, "We protecting him. We protecting the little cuz. The little one is the shooter." "We not the shooter. He is."

Wheeler was surprised that they were arrested because they "cleared" the cars and the pistols. The gun belonged to Wheeler's "big homie[ ]," who disposed of it afterwards. "Soon as [Wheeler] got the word," Wheeler told one of the other drivers, who totaled his car. Wheeler sold his vehicle. "The other . . . I don't know what he did, but he gone, so it cleared us off the map." Wheeler thought they had to have been arrested because of their

cars, though—he and another "homie" who was arrested were the only ones who had cars registered in their names.

After the "homie" got shot in the neck, Wheeler "and the big homie, . . . we double up, triple up cars. And we go take the young homies and bust on a Tramp nigga in the Tramps." When they saw the Tramps, five or six of them passed by.

Detective Flores also had Maxwell walk in front of Wheeler's holding cell. Wheeler told the agent that Maxwell was arrested because he was driving the car in front. Wheeler indicated that Maxwell was not a shooter. He did not think that Maxwell would talk to the police because he did not see or do anything. Wheeler "didn't even see who laid it out." He heard the sound of the shots and "[t]hey come, bro, back to the car."

Wheeler told the agent that the police had one young man in custody in connection with another matter. The agent asked if Wheeler thought the young man snitched. Wheeler responded, "I think they asked him first, on everything."

Wheeler told the agent that "it was a pile of us in each car" and "they not getting everybody." Wheeler said, "Big homies told me at first gray. He said gray, burgundy, black, black, gray, burgundy." Wheeler said "the little nigga" did not have a car and hopped in with him.

Wheeler said the only evidence the police had "was a couple of shells on the ground with a dead man." There were no cameras on the corner. When the agent suggested that their names might have come up on Facebook, Wheeler agreed. He said, "Oh, only thing y'all probably heard was the Eight Treys and the 100s is beefin'. Oh, somebody came and smacked us. Oh, a red or a burgundy or a silver car. Oh. Oh, fool, Blocc got those

16

cars. Oh, them three niggas. Oh, let's pull them in and see if they give each other up."

## DISCUSSION

### *Peremptory Challenges*

Walker contends that the trial court erred in ruling that the prosecutor provided race-neutral reasons for her peremptory challenges of Prospective Jurors Nos. 17 and 71, who were both Black females.[6] Walker first argues that Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill 3070), which rendered presumptively invalid several justifications offered to support peremptory challenges, applies retrospectively to his case. Alternatively, Walker argues that we should consider the reasons that the prosecutor gave in support of her peremptory challenges under *People v. Wheeler* (1978) 22 Cal.3d 258 and *Batson v. Kentucky* (1986) 476 U.S. 79, which were controlling precedent at the time of Walker's trial, in the context of Assembly Bill 3070 and Assembly Bill No. 2542 (2019–2020 Reg. Sess.) (Assembly Bill 2542), regardless of whether either bill applies in his case.[7] Finally, Walker argues that the reasons given were not race-neutral under a *Batson/Wheeler* analysis, even if Assembly Bill 3070 is inapplicable. The arguments lack merit.

---

[6] Both Walker and codefendant Maxwell are Black.

[7] Walker does not assert that Assembly Bill 2542 is applicable, only that *Batson/Wheeler* should be considered in light of its passage.

17

## Assembly Bill 3070 and Code of Civil Procedure Section 231.7 Do Not Apply to Walker's Case

Assembly Bill 3070 added section 231.7 to the Code of Civil Procedure. The statute sets forth a procedure by which a defendant may object to a prosecutor's peremptory challenges, when made on the basis of "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (*Id.*, § 231.7, subd. (a).) The legislation renders presumptively invalid several grounds for peremptory challenges. (*Id.*, § 231.7, subd. (e).)

Walker contends that Code of Civil Procedure section 231.7 is an ameliorative change in the law that applies to his case retroactively under *In re Estrada* (1965) 63 Cal.2d 740. We conclude that, regardless of whether Assembly Bill 3070 applies retroactively to cases not yet final on appeal under *In re Estrada*, section 231.7 does not apply to Walker's case. Section 231.7, which became effective on January 1, 2021, expressly states that its provisions apply to trials in which jury selection began on or after January 1, 2022. (Code Civ. Proc., § 231.7, subd. (i).) As Walker concedes, jury selection in his trial began on June 28, 2021, before section 231.7's provisions became operative. Thus, the plain language of Code of Civil Procedure section 231.7 precludes its application here.

## The *Batson/Wheeler* Analysis is Unaffected by Assembly Bill 3070 and Assembly Bill 2542

Walker's argument that the *Batson/Wheeler* analysis should be viewed in the context of Assembly Bill 3070 and Assembly Bill 2542 regardless of whether either bill directly applies also fails.

With respect to Assembly Bill 3070, our Supreme Court has declined to adopt the enactment of Assembly Bill 3070 as a basis for reconsidering the *Batson/Wheeler* line of precedent in cases like Walker's where *Batson* and *Wheeler* were controlling at the time of the defendant's trial. (*People v. Battle* (2021) 11 Cal.5th 749, 776, fn. 9.)

Assembly Bill 2542, known as the California Racial Justice Act of 2020 (the Racial Justice Act), added section 745 to the Penal Code, effective January 1, 2021. The statute prohibits the state from seeking or obtaining a criminal conviction or seeking, obtaining, or imposing a sentence "on the basis of race, ethnicity, or national origin." (§ 745, former subd. (a)) At the time of Walker's trial, section 745's provisions were applicable in cases where the judgment had not been entered prior to January 1, 2021. (*Id.*, subd. (j).) The judgment was entered in Walker's case on September 2, 2021. The statute therefore applied, and provided Walker an opportunity for relief independent of *Baston/Wheeler*. At that time, relief under section 745 could be sought by motion prior to the entry of judgment or, if judgment had been entered, by petition for writ of habeas corpus. (§ 745, subd. (b); § 1473, subd. (f).) Walker forfeited any argument regarding Assembly Bill 2542 by failing to file a motion with the trial court pursuant to section 745, subdivision (b).

## The Trial Court Did Not Err in Finding the Prosecutor's Reasons for Peremptory Challenges Race-Neutral Under *Batson/Wheeler*

Finally, Walker argues that the prosecutor's stated reasons for her peremptory challenges were not race-neutral under *Batson/Wheeler*. We reject this argument as well.

In *People v. Wheeler*, *supra*, 22 Cal.3d at pages 276 to 277, the California Supreme Court held that a prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group membership violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. *Batson v. Kentucky*, *supra*, 476 U.S. at page 97 held, among other things, that such a practice violates a defendant's right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution. The *Batson/Wheeler* principles apply to peremptory challenges excusing jurors improperly on the basis of race, gender, or ethnic grounds. (*United States v. Martinez–Salazar* (2000) 528 U.S. 304, 315; *People v. Willis* (2002) 27 Cal.4th 811, 813–814.)

The standard for reviewing a *Batson/Wheeler* motion is well established. State and federal constitutional authority imposes a three-step inquiry: "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination.

The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

Where, as here, "the trial court found a prima facie case of racial discrimination and the prosecutor stated a reason for the strikes at issue, the question before us is whether defendant has shown it ' "more likely than not that" ' at least one of the ' "challenge[s] was improperly motivated." ' [Citations.] 'The existence or nonexistence of purposeful racial discrimination is a question of fact.' [Citation.] [¶] The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1076.) The "force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation." (*Id*. at p. 1077.) "Given this framework, a trial court's ruling on that ultimate question is ordinarily reviewed with deference." (*Ibid*.) "Thus, '[w]hen the trial court makes a sincere and reasoned effort to evaluate the [proffered] reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them.' " (*Ibid*.)

## Prospective Juror No. 17

*Proceedings*

On her juror questionnaire, Prospective Juror No. 17 stated that she was single, unemployed, and studying to become a veterinarian. She indicated she had either good or bad experiences with police, but did not state which and did not

21

provide further explanation. She had no friends or family members who were police. She had a family member or members who had been arrested, which resulted in "[j]ail time." Prospective Juror No. 17 stated that she had "fought [people] before." She indicated she could be impartial and fair regarding gang and firearm evidence presented at trial.

The court questioned Prospective Juror No. 17 regarding her family members who had been arrested. Prospective Juror No. 17 stated that her father and some cousins had been arrested. The court asked whether those experiences would impact her ability to be fair in this case. Prospective Juror No. 17 responded, "To be honest with you, I'm not sure. I'm not, like—I don't really—that's—honest answer, I don't really know, yeah." Prospective Juror No. 17 stated she could judge a police officer under the same standard as any other witness. There was a single incident in which she fought another person, and the police were called, but no charges were filed. Prospective Juror No. 17 stated that she could be fair to both parties in the case. She informed the court that she had a scheduled surgery she "need[ed] to attend" that might conflict with the trial.

Later, the prosecutor addressed the potential jurors, "I know the judge has said this, but you are not in charge of punishment. If you were to convict in this case, punishment is not something you can even consider. You can't consider punishment when you're deciding guilty or not guilty, period. It cannot enter into the equation."

The prosecutor then inquired, "Is there anyone here—for whatever reason, whether it's because you had a family member who has been incarcerated or because you have expressed beliefs that you believe the system is not a good system, is there anyone

22

who believes they cannot set aside that issue of punishment, that it will be on their mind and no matter what I do, no matter what evidence I put on, no matter what I prove, you will not be able to convict because you will be so concerned about that issue of punishment?"

Several jurors indicated that they could not set aside the issue of punishment. The prosecutor continued, "I appreciate your honesty. The judge is going to tell you you can't consider it, and you're saying very clearly I will. [¶] Is that fair to say? [¶] Let me start with you, Juror No. 17."[8]

"Prospective Juror No. 17: I just want to understand. So if we come back—if I'm on the jury and we come back with a guilty—they're guilty, is that what it is? If we come back and say they're guilty, they're guilty.

"[Prosecutor]: If you have heard all the evidence, you're on the jury, we've given closing arguments and the judge has instructed you on the law, which you don't know any of at this

---

[8] Although Walker asserts that Prospective Juror No. 17 was not among the prospective jurors who indicated they would not be able to convict due to concerns about punishment, we do not find the record to be so clear. The prosecutor read out the numbers of several prospective jurors who answered affirmatively. Although Prospective Juror No. 17 was not in that list, the prosecutor indicated that she would try to question people who expressed an inability to separate punishment and guilt in numerical order. She then said, "Let me start with you, Juror No. 17." If Prospective Juror No. 17 had not raised her hand the prosecutor would have had no reason to address her. Regardless, in questioning Prospective Juror No. 17 expressed her concerns about punishment and indicated that she could not separate punishment from guilt.

point, you go into the jury room, you deliberate and you all agree on a verdict, then that verdict is guilty.

"Prospective Juror No. 17: So then from there, the judge proceeds with what punishment?

"[Prosecutor]: The judge will decide what punishment.

"Prospective Juror No. 17: So in a way we are responsible for the punishment they're getting because we're giving the guilty verdict?

"[Prosecutor]: You're not."

"[Prosecutor]: It's not about responsibility. It's about what your role is. And I think what you're telling me, Juror No. 17, is that you will feel responsible—

"Prospective Juror No. 17: Yes.

"[Prosecutor]: —for what happens after.

"Prospective Juror No. 17: Correct.

"[Prosecutor]: Is that what you're telling me.

"[Prospective Juror No. 17]: Correct. I feel if I'm making that decision and that decision is on me to say whether they're guilty or not, whether I'm a part of choosing their punishment for however long they're supposed to be incarcerated, I'm still putting them in that place that they are going to be incarcerated for whatever they'll get.

"[Prosecutor]: I appreciate that. . . . Do you believe that your feeling of responsibility in that—

"Prospective Juror No. 17: Uh-huh.

"[Prosecutor]: —will prevent you from giving both sides a fair trial? And that includes the prosecution.

"Prospective Juror No. 17: I don't want to say no entirely because I haven't heard your side or what happened to the victim per se, but I can't sit here and say that entirely yes, that I would

be—I mean, I'll be honest with you. I really don't know. I'm siding more so with the defense just being here, just an emotional standpoint.

"And also being an African-American seeing fellow African-American people sit there and then knowing what's going on in the country, I am more on the defense side. I do want to give your side a chance to explain what happens and be fair on that end, but I do have my own thoughts and emotions about that."

"[Prosecutor]: So it sounds like—it also sounds like—you raised a couple of issues, obviously the issue of the race of the defendants.

"Prospective Juror No. 17: Uh-huh.

"[Prosecutor]: The issue of feeling responsible for what happens next.

"Prospective Juror No. 17: Exactly.

"[Prosecutor]: It seems as if me saying or the court saying that you can't consider those things really isn't going to stop you from considering those things.

"Prospective Juror No. 17: Yeah. And I mean, because—I get there is a law, but I also get I have to do what I feel is right toward my own beliefs and morals, too, despite what the law might be. Sometimes it's not always right, and then I also have to think about, too, they are—like you said, the social issues. They are African-American men, and I am an African-American woman.

"Seeing—putting fellow African-American men in the prison system as the other person—it's not the best system to be a part of. So that's in my mind, too, thinking on that part. Do I want to be a part of that?"

The court then addressed Prospective Juror No. 17, "I explained jury nullification, which is voting how you feel and disregarding the law. That's improper. You can't do that. It's juror misconduct. And then there is following the process and the law that I do give you and considering your own experiences within that. [¶] So we need to know which one is what you will engage in. I'm not here to tell you which you should. But do you believe, because of the things you mentioned, that you would just disregard the law that I give you and vote however you felt was appropriate? Or you would follow the law that I give you but bring into play your own life experiences?"

"Prospective Juror No. 17: I wouldn't disregard the law, but I will say I'm not—I more so would just have to listen. I can't sit here and say I'm going to go ahead and say that's what the law says, that's what needs to be done. Like, I said, the law isn't always right. It doesn't always cater to everybody. I honestly just don't know."

The court explained that the jurors could not correct the law in court, they must correct the law by voting for legislators who would represent their views. The court reiterated that if selected as a juror, Prospective Juror No. 17 would be required to follow the law as instructed. The court stated, "Now, that doesn't mean you disregard your own life experiences, but you can't disregard the law. Okay?" Prospective Juror No. 17 responded, "Uh-huh." The court then asked if any jurors did not understand. There is no indication in the record that Prospective Juror No. 17 raised her hand.

Later, the prosecutor requested that Prospective Juror No. 17 be removed for cause. The prosecutor stated, "I think she really wants to try to be fair but that she ultimately described,

26

you know, only being able to follow the law if she agrees with the law. That's my biggest concern with Juror No. 17. [¶] She also, when I followed up a second time with the question about punishment, was clear that she would not be able to decide the case without considering punishment. And we talked about both of those issues at length, and I think ultimately she indicated that she would not be able to do those things. She also said she would side with the defense."

After the court declined to remove Prospective Juror No. 17 for cause, the Prosecutor exercised a peremptory challenge against the prospective juror. Defense counsel made a *Batson/Wheeler* objection.

The prosecutor explained her reasons for the peremptory challenge, Prospective Juror No. 17 "repeatedly said she could not be fair. She said she sided with the defense; that she has— when she was younger, on multiple occasions, fought people; that she has family who [have] been arrested and in jail; that she cannot put aside the issue of punishment when determining the issue of guilt; that she would follow the law if she agrees with it but she does not believe that the law is always right and, therefore, she can't always follow it."

Defense counsel countered that fighting, or having family arrested or in jail was not related to a person's ability to follow the law. Counsel asserted the prosecutor's grounds were proxies for race.

The prosecutor responded, The "reason I mentioned family members having been in and out of jail is because she said she would not be able to set aside the issue of punishment when determining the issue of guilt." The prosecutor emphasized that the issue had nothing to do with race.

27

The court accepted the prosecutor's reasons as race-neutral, stating, "It is about jury nullification and that did concern the court as well, not to the extent it rose to [a] challenge [for cause] but certainly as far as a proper exercise of a peremptory. [¶] She did indicate that she would feel compelled to vote her conscience and she wasn't sure she could follow the law if she felt the law was an immoral law, to paraphrase—to paraphrase her words. [¶] On that basis, the court finds it to be a race-neutral exercise of [a] peremptory" challenge.

*Analysis*

Substantial evidence supports the trial court's determination that the prosecutor's stated race-neutral reasons for her peremptory challenge of Prospective Juror No. 17 were credible and genuine, and that in light of the total circumstances there was not a showing of purposeful discrimination.

Prospective Juror No. 17 was given multiple opportunities to clarify both her position on the separation of guilt and punishment and her position on following the law as given. Each time, she ultimately reiterated that she was at best uncertain regarding her ability to separate guilt from punishment and to follow the law as instructed, despite admonitions from the prosecutor and the court that jurors were required to determine guilt separately from punishment and to follow the law regardless of their personal opinions. Walker places great emphasis on the fact that when the trial court gave a final admonition to Prospective Juror No. 17 that jurors must comply with both requirements if empanelled and asked if she understood, Prospective Juror No. 17 responded, "Uh-huh."

28

Walker also emphasizes that Prospective Juror No. 17 did not raise her hand when the court asked if any jurors did not understand what the court had said to Prospective Juror No. 17. We do not take Prospective Juror No. 17's indication that she understood what the court had just said to her as agreement that she would follow the court's instructions under the circumstances of this case. If the juror had not made repeated contrary statements, her acknowledgment that the court expected her to follow the law and not consider punishment might have been sufficient to demonstrate that she would do so. Here, however, Prospective Juror No. 17 had indicated multiple times that she understood what the law required but could *not* say for certain that she would follow the court's directions or disregard punishment if seated on the jury. Substantial evidence supports the conclusion that the prosecutor's articulated race-neutral reasons for her peremptory challenge were credible and genuine.

### Prospective Juror No. 71

*Proceedings*

On her juror questionnaire, Prospective Juror No. 71 stated that she was a psychologist. She had family members in law enforcement. Neither she, her family members, or close friends had been arrested. She was a witness to an incident in which a woman was attacked by a group of people, and she reported the incident to the police. Prospective Juror No. 71 had one friend who had been involved in a domestic violence incident, but the prospective juror was not personally involved in the incident. Prospective Juror No. 71 indicated she could be impartial and

fair regarding gang and firearm evidence presented at trial. With respect to whether there was anything further that she would like the court and parties to know that might affect her ability to be fair and impartial in this case, she said that she has a lot of research on trauma and violence.

During voir dire, Prospective Juror No. 71 asked for a sidebar to address issues regarding her questionnaire responses. She explained, "I wasn't aware the information on here that was going to be disseminated. I have personal information on here that could be easily identifiable as far as where I live, where my husband works and I just—I wanted to ask a question about that because I felt like my anonymity could be blown." Prospective Juror No. 71 indicated that she was concerned about her personal information being shown to the defendants due to the nature of the case. Counsel agreed not to share Prospective Juror No. 71's questionnaire with the defendants.

Maxwell's counsel inquired whether Prospective Juror No. 71 would have trouble sitting on the jury because she would be worried about her safety. Prospective Juror No. 71 responded that she had asked for the sidebar due to her concern. Counsel then said, "I see your anxiety. I'm just trying to figure out if telling—if this—what the judge has ordered [(that counsel not share the prospective juror's questionnaire responses with defendants)] is going to allay your concerns or if, no matter what, you're still going to feel like this." Prospective Juror No. 71 responded, "I don't know. If you asked me right now, I still feel pretty anxious."

The prosecutor asked, "Is it fair to say just sitting on a case like this will cause you anxiety or concern?" Prospective Juror No. 71 answered, "I'm typically very anxious, so probably." The

prosecutor then asked whether Prospective Juror No. 71's anxiety would affect her verdict or if she would fear retaliation. Prospective Juror No. 71 responded, "I don't know if I can actually answer that at this moment just because I'm in a pretty heightened state. If I was to say—if I had to give an answer now, yes. But after thinking about it, I could probably change my mind." Prospective Juror No. 71 explained that she had not become anxious about the case when the charges and allegations were read. It was only when she started to think about the implications of her personal information being shared that she became concerned.

Earlier in voir dire, a different prospective juror— Prospective Juror No. 74—indicated that it would be very difficult for her to consider the evidence in a manner that was fair and impartial to both sides due to her concerns regarding social justice. Her views would not be changed by knowing that both the defendants and the victims were Black because her concern regarded "how the system works with people from certain populations." She stated that the fact that the jury decided whether a witness was credible and whether the case had been proven did not change her perspective. She informed the court and the parties, "Whatever the evidence is, I'm going to feel conflicted."[9]

The prosecutor asked whether Prospective Juror No. 71 had agreed with statements Prospective Juror No. 74 made about feeling conflicted and not liking the criminal justice system. In

---

[9] The court later excused Prospective Juror No. 74 for cause because she indicated that she could not be fair. Prospective Juror No. 74 was not Black.

response to the prosecutor's query, Prospective Juror No. 71 explained that as a psychologist she could understand Prospective Juror No. 74's perspective, but she would not have a hard time being fair herself.

Prospective Juror No. 71 requested that the court redact the information regarding her spouse's occupation. Both sides stipulated to the redaction. Prospective Juror No. 71 also informed the court that she had potential scheduling conflicts.

Later in voir dire, the prosecutor asked, "Is there anyone here—for whatever reason, whether it's because you had a family member who has been incarcerated or because you have expressed beliefs that you believe the system is not a good system, is there anyone who believes they cannot set aside that issue of punishment, that it will be on their mind and no matter what I do, no matter what evidence I put on, no matter what I prove, you will not be able to convict because you will be so concerned about that issue of punishment?"

Prospective Juror No. 71 identified herself as someone who could not put punishment aside when determining guilt.

The prosecutor requested that Prospective Juror No. 71 be removed for cause, "Number 71, I think she just was very afraid—not just some of the issues that came up today. For example, she indicated that she could not—I hate to use the double negative—not not consider punishment when determining guilt. She had a lot of fears yesterday about her questionnaire, concerns that I think could cut both ways in the trial as to both sides. [¶] I think she wants to be fair, but she was clearly actually terrified. She talked in her questionnaire . . . about lots of research on trauma and violence and the effects, and I don't

know whether there is something she's witnessed that we don't know about."

The prosecutor also expressed concern that Prospective Juror No. 71 nodded repeatedly and appeared in agreement with Prospective Juror No. 74 when that juror spoke about "not believing in the system and in jail and saying that there is systemic racism so essentially there couldn't be a fair trial." The prosecutor acknowledged that at sidebar Prospective Juror No. 71 had given a reasonable explanation in that regard, "so I probably shouldn't use this as part of cause." Walker's counsel did not express a view regarding the prosecutor's reasons for requesting Prospective Juror No. 71's removal for cause.[10] The court declined to remove Prospective Juror No. 71 for cause.

The prosecutor exercised a peremptory challenge to excuse Prospective Juror No. 71. Maxwell's counsel made a *Batson/Wheeler* motion "for the reasons asserted previously" in which Walker's counsel joined, and a sidebar was held. The prosecutor explained, "For all the reasons that I indicated previously when I asked for her to be dismissed for cause, one of which was that the punishment issue was of huge concern to her.

---

[10] Maxwell's counsel observed that at the time the parties moved for excusal of certain jurors for cause there were seven Black jurors on the panel, and the prosecution had asked that four of the seven be removed for cause. Counsel argued against removal of the other three Black prospective jurors but specifically excepted Prospective Juror No. 71 from the argument because her circumstances differed from the other three prospective jurors' circumstances. After the jurors were sworn, the court noted for the record that two seated jurors were Black women and one alternate juror was a Black male.

Also, as a psychologist, she indicated that it would be difficult for her to not think to consider all the various factors outside of just what she would be hearing in court, psychological reasons and all of that based on her job and her research on trauma and community violence. [¶] She was nodding and agreeing with another juror when they discussed concerns with the racial aspect of the case. She indicated that she was very afraid but yesterday she appeared extremely fearful about being involved in this trial to the point that she asked us to redact out part of her questionnaire."

Maxwell's counsel responded, "She indicated she could not consider punishment in the issue of determining guilt," but counsel offered no support for her belief that this was the case. The court found the prosecutor's reasons to be race-neutral, and excused Prospective Juror No. 71.

*Analysis*

Substantial evidence supports the trial court's determination that the prosecutor's stated race-neutral reasons for her peremptory challenge of Prospective Juror No. 71 were credible and genuine, and that purposeful discrimination was not shown under all the circumstances.

Prospective Juror No. 71 expressed serious concerns about the defendants' ability to identify her, and she remained anxious about the issue even after counsel agreed not to share her information with defendants. When the prosecutor asked whether Prospective Juror No. 71's anxiety would affect her verdict or if she would fear retaliation she responded that if she had to answer at that moment, she would say "yes." She would

34

try not to let her fear keep her from properly considering the evidence, but she could not unequivocally say that she could overcome her fear. She asked the court to redact certain information on her anonymous questionnaire out of concern that she could be identified.

Prospective Juror No. 71 also identified herself as someone who could not set aside punishment when determining guilt, although jurors were not permitted to consider punishment. She made no statements to the contrary at any point. She simply acknowledged the trial court's statement of the law by not raising her hand when the court asked if anyone did not understand. Like Prospective Juror No. 17, she had previously indicated that she understood what was required of her, but stated she was not sure she could actually do what was required. Under the circumstances, we cannot say that her indication that she understood the court was equivalent to a statement that she would follow the law. There is substantial evidence in the record to support the trial court's determination that the prosecutor's articulated race-neutral reasons for exercising a peremptory challenge against Prospective Juror No. 71 were credible and genuine.

***Assembly Bill 333***

In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.), which, as pertinent here, added section 186.22 to the Penal Code. (*People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*).) Section 186.22, subdivision (b)(1) increased the punishment for "a person who is convicted of a felony committed

35

for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" by providing for a sentencing enhancement "in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the person has been convicted."

In 2021, the Legislature made several substantive changes to section 186.22 through the passage of Assembly Bill 333. (*Tran*, *supra*, 13 Cal.5th at p. 1206.) The legislation also "added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*Ibid*.) Assembly Bill 333 became effective on January 1, 2022, after Walker's trial. It is uncontested that the jury was not instructed on the new requirements under Assembly Bill 333.

Walker contends that Assembly Bill 333 ameliorates punishment and should therefore apply retroactively to his case under *In re Estrada*, *supra*, 63 Cal.2d 740. Walker argues that Assembly Bill 333's amendments to section 186.22 require us to reverse the gang enhancements, as well as the jury's true finding on the special allegation that Walker was an active participant in a criminal street gang when he committed the murders in counts 1 and 2 (§190.2, subd. (a)(22)). Walker also argues that because the gang allegations were not bifurcated from the charges in his case, he is entitled to reversal of the jury's guilty verdicts pursuant to section 1109. We address his arguments below.

We reverse the gang enhancements imposed under section 186.22, subdivision (b) in all counts; we reverse the special circumstances imposed pursuant to section 190.2, subdivision (a)(22) in counts 1 and 2; and we remand the matter to the trial court to give the prosecution the opportunity to elect whether to seek a retrial of the enhancements and special circumstances. We decline to address the issue of whether section 1109 is retroactive, as we hold that any error would have been harmless under any standard.

### Section 186.22

*Amendments to Section 186.22, Subdivision (b)*

Prior to the passage of Assembly Bill 333, a " 'criminal street gang' " was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, former subd. (f).)  "Assembly Bill 333 . . . narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] . . . [W]hereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such

pattern have been '*collectively* engage[d] in' by members of the gang." (*Tran, supra,* 13 Cal.5th at p. 1206.)

Section 186.22, former subdivision (e)(1) defined a " 'pattern of criminal gang activity' " as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain enumerated predicate[11]] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate [occasions], or by two or more persons." The new amendments made multiple changes to the requirements to show a pattern of criminal activity, including that "(1) the last [predicate] offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the [predicate] offenses were committed by . . . gang 'members,' as opposed to just 'persons'; (3) the [predicate] offenses commonly benefitted a criminal street gang; and (4) the [predicate] offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) . . . Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be

---

[11] "The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses." (*People v. Valencia* (2021) 11 Cal.5th 818, 829.) The term *predicate offense* is not contained in section 186.22, but its meaning and use are well-established in California precedent.

'more than reputational.' (§ 186.22, subd. (g).)[12]" (*Tran, supra,* 13 Cal.5th at p. 1205.) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

### *Effect of Amendments on Gang Enhancements*[13]

In his opening brief, Walker argues that the section 186.22, subdivision (b) enhancements must be reversed because: (1) the jury was not instructed regarding the elements of the enhancements as amended by Assembly Bill 333; (2) the prosecution offered no evidence that the predicate offenses used to demonstrate a pattern of criminal activity commonly

---

[12] Effective January 1, 2023, section 186.22, subdivision (b)(3) requires the trial court to impose "the middle term of the sentence enhancement, unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its choice of sentencing enhancements on the record at the time of the sentencing." (Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022, operative Jan. 1, 2023.)

[13] Walker argues, the People concede, and we agree that the changes to section 186.22 apply retroactively to Walker's case, as his case was not yet final on the effective date of Assembly Bill 333. (See, e.g., *Tran, supra,* 13 Cal.5th at p. 1206.) The amendments have the effect of " 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants." (*Tran, supra,* 13 Cal.5th at p. 1207.)

39

benefitted the Rollin' 100's; and (3) the prosecution offered no evidence that the benefit of the predicate offenses to the gang was more than reputational. "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran*, *supra*, 13 Cal.5th at p. 1207.) The People argue that reversal and remand is not required in this case in light of the overwhelming evidence in the record that the predicate offenses used to prove a pattern of criminal gang activity still qualify under the amendments to section 186.22. The People contend that the jury would still have found the gang enhancements true beyond a reasonable doubt. We agree with Walker that the enhancements must be reversed.

At trial, to prove that the Rollin' 100's engaged in a pattern of criminal gang activity, the prosecution offered evidence of three crimes committed by Rollin' 100's members and enumerated in section 186.22, subdivision (e)(1): (1) on July 10, 2017, Fuller violated section 29800 (felon in possession of a firearm); (2) on June 22, 2015, Charles Lewis violated section 246 (shooting at an occupied building); and (3) on April 1, 2017, Hakeem Garbutt violated section 25850, subdivision (a) (carrying a loaded firearm in public). The predicate offenses were proven through certified electronic dockets reflecting each conviction and the testimony of Los Angeles County Sheriff's Department Sergeant Marco Magana, who was personally involved in the arrest and/or investigation of each of the predicate offenders and knew each offender to be a member of the Rollin' 100's.

The People argue that the prosecution demonstrated that the predicate offenses were more than reputational because Sergeant Magana testified about the importance of retaliation as a benefit to a gang. The sergeant testified that "[t]ypically, in gang culture, it's almost a given that retaliation is a must and the best retaliation is immediate and worse than the original offense. If a gang member from a certain gang is assaulted by being jumped, per se, by rival gang members, that gang member should—shall—in the gang culture go back, recruit fellow gang members and go back to that enemy's territory and up the force one level by possibly either assaulting them worse with a knife, a bat, or some type of an object or even shoot. [¶] Then that retaliation from the other gang, once they're assaulted, they're supposed to retaliate as well. But that point, if the gang that was initially assaulted is feared and more respected than the gang member that got shot at, they might stop there because they don't want to go into a retaliation back and forth with the gang that's more feared or respected or they're afraid of." Sergeant Magana further testified that a gang that fails to retaliate looks weak. The sergeant listed multiple acts that could constitute retaliation, including "[a]ssaults, hands and feet; assaults with a knife; assaults with objects; shootings; murders; vandalism by crossing them out; banging on them; . . . shooting at their cars; shooting at known gang members, family members' houses." Committing these crimes benefits the gang by demonstrating that they are violent and willing to retaliate. This instills fear in the community and in rival gangs.

In addition to other trial evidence about the *charged* offenses, Sergeant Magana's testimony supports the conclusion that those *charged* offenses were committed in retaliation for the

41

shooting of Rollin' 100's members earlier that same day; however, the prosecution presented no evidence that the three *predicate* offenses were committed in retaliation or benefitted the Rollin' 100's in any way. Notably, it is unclear how two of the predicate offenses—felon in possession of a firearm and carrying a loaded weapon—could constitute retaliation, particularly where they were not tied to any prior act by another gang that would call for retaliation. While shooting at an occupied building could be a form of retaliation, again there was no evidence of prior incidents that would have caused the predicate offender to act in retaliation. Although Sergeant Magana had personal knowledge of all three predicate offenses, he did not explain the motivation behind those offenses or the benefit of any of them to the Rollin' 100's.

Because the jury was not presented with evidence that the predicate crimes actually benefitted the Rollin' 100's or that the benefit was more than reputational, on this record we cannot say that the error did not contribute to the jury's true findings on the gang enhancements beyond a reasonable doubt. (See *Tran*, *supra*, 13 Cal.5th at p. 1207 [reversing gang enhancements where jury was not presented with evidence gang members collectively engaged in pattern of criminal gang activity].)

*Effect of Amendments on Active Gang Participant*
*Special Circumstances*

Although Assembly Bill 333 does not directly address gang participation special circumstance findings imposed under section 190.2, subdivision (a)(22), the special circumstance allegation incorporates within its elements concepts defined in section

42

186.22. Section 190.2, subdivision (a)(22) requires that the prosecution prove, beyond a reasonable doubt that the "defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." As we have discussed, "criminal street gang" and "pattern of criminal activity," which must be proven to impose a special circumstance allegation under section 190.2, subdivision (a)(22), have undergone significant substantive changes following the enactment of Assembly Bill 333. As a consequence, the amendments to section 186.22 necessarily alter the elements of proof for gang participation special circumstances.[14]  (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346–348.)

### *Remedy*

We reverse the true findings on the gang enhancements (§ 186.22, subd. (b); counts 1–6 & 8) and the active participant in a criminal street gang special circumstance allegations (§ 190.2, subd. (a)(22); counts 1 & 2), and remand to the trial court to afford the prosecution an opportunity to retry the enhancements and special circumstance allegations under current law. (See *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1091 [vacating gang enhancements in light of Assembly Bill 333 and remanding for limited retrial]; *People v. Lopez, supra,* 73 Cal.App.5th at

---

[14] The People did not address the effect of Assembly Bill 333 on the gang participation special circumstances in the respondent's brief.

p. 346 [same].) In the event that the People do not elect to retry the enhancements and/or special circumstance allegations, the court shall resentence Walker. (See *Delgado*, at p. 1091.)

**Section 1109**

As relevant here, section 1109 provides:

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence."

Walker relies on *People v. Burgos* (2022) 77 Cal.App.5th 550, 556 to 568, in which the appellate court held that section 1109 is retroactive under *In re Estrada, supra*, 63 Cal.2d 740. In determining whether remand was appropriate, the *Burgos* court stated: "The case law does not clearly establish whether or how harmless error analysis applies in this instance. It is difficult to determine how the outcome of the trial would have been affected if it had been bifurcated to try the gang enhancements

44

separately; the nature of the proceeding would have been entirely different. This circumstance likely constitutes 'structural error' because it 'def[ies] analysis by harmless-error standards.' [Citation.] . . . [Citation.] . . . [¶] Even if harmless error analysis is amenable, it is not clear whether we should apply the federal or state law standard." (*Burgos*, at p. 568.) Ultimately, *Burgos* held that the error was not harmless in that case because the evidence of identity was not overwhelming, and there was no evidence that one of the defendants participated in the robbery beyond the fact that he was present. (*Id.* at pp. 568–569.)

In *Tran, supra*, 13 Cal.5th at page 1208, our Supreme Court declined to decide whether section 1109 applies retroactively because it concluded any error was harmless under any standard.[15] *Tran* rejected the argument that failure to bifurcate gang enhancements constitutes structural error. (*Ibid.*) The court then analyzed the issue for harmlessness under both the federal standard articulated in *Chapman v. California* (1967) 386 U.S. 18, and the state standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*Tran*, at pp. 1209–1210.) With respect to *Chapman* error, *Tran* concluded that the prosecutor's use of gang

---

[15] There is a split of authority on whether section 1109 is retroactive. (Cf. *People v. Burgos, supra*, 77 Cal.App.5th at pp. 564–568, review granted July 13, 2022, S274743 [retroactive]; *id.* at pp. 569–575 (dis. opn. of Elia, J.) [not retroactive]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 [retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64–65, review granted Aug. 17, 2022, S275341 [not retroactive]; *id.* at pp. 67–70 (conc. opn. of Wilson, J.) [retroactive]; *People v. Perez* (2022) 78 Cal.App.5th 192, 206–207, review granted Aug. 17, 2022, S275090 [not retroactive].)

evidence did not make the trial fundamentally unfair. (*Tran*, at p. 1209.) It was permissible for the trial court to admit gang evidence to explain that witnesses may have made contradictory statements due to fear of retaliation and the gang evidence used to demonstrate that a codefendant would have had reason to aid and abet the defendant was not relevant to defendant, who was the perpetrator. (*Ibid*.) Regarding *Watson* error, the defendant in *Tran* had only argued generally that the trial court could have exercised its discretion to exclude some of the gang evidence admitted at trial and did not explain how that evidence would have affected the jury's verdicts and findings. (*Tran*, at pp. 1209–1210.) In light of the overwhelming evidence of the defendant's guilt, *Tran* concluded that it was not reasonably likely that exclusion of the gang evidence would have changed the outcome of trial. (*Ibid*.)

This case is analogous to *Tran*. The admission of gang evidence did not make the trial fundamentally unfair. Although Walker argues that he did not have the opportunity to request that the gang enhancements be bifurcated, that statement is inaccurate. Walker had the opportunity to request bifurcation of the gang allegations pursuant to section 1044, " 'which vests the trial court with broad discretion to control the conduct of a criminal trial.' " (*People v. Montano* (2022) 80 Cal.App.5th 82, 109, fn. 10.) He does not assert that he made a request for bifurcation of the gang allegations, and we have found nothing in the record to indicate that a request for bifurcation was made. Walker does not argue that the trial court had an obligation to order bifurcation sua sponte.

Walker does not explain the basis for his belief that evidence of his gang affiliation would not have been admissible to

prove the charges in his case. Section 1109 does not preclude introduction of gang evidence in a bifurcated proceeding where that evidence is relevant to proof of the charged offenses. (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) Here, the gang evidence was directly relevant to the charges against Walker to establish motive and identity.

The evidence against Walker was overwhelming. Dampeer, whose narrative of events was supported by ample evidence, testified that Walker was one of the two gang members chosen to be shooters, that he ran toward the victims holding a gun, and that shots could be heard seconds after Walker disappeared from his view. In addition to Dampeer's testimony, Walker's own statements provided strong evidence of identity and motive. Footage from an officer's body camera recorded Walker speaking with someone on his cell phone right after Hutchins was shot in which Walker indicated that he intended to avenge the shooting, "[J]ust provide the shit, and we gonna do what we got to do. Just bring some shit. Trust me." In jail calls recorded after the crimes had been committed, Walker told Hutchins that he and Moore, who Dampeer identified as the second shooter, made Hutchins look good. Hutchins disagreed and replied that Walker made himself look good; Hutchins went to the hospital. This was consistent with Dampeer's testimony that Walker's moniker Infant Killa indicated that he was under Hutchins and would be expected to retaliate if Hutchins was shot.

Finally, it does not appear that the jury was biased by the gang evidence presented in this case. The jury considered the same gang evidence when determining whether Maxwell was guilty of the charged crimes and acquitted Maxwell on all counts.

Under the circumstances, any error was necessarily harmless under both *Chapman* and *Watson*.

### *Third Party Culpability Instruction*

Walker next contends that the trial court's refusal to give his proposed instruction on third party culpability violated his constitutional due process right to present a defense. We conclude that, even if the trial court's refusal to give the instruction was error (an issue we decline to decide), the error was harmless under any standard.

#### **Proceedings**

At trial, Dampeer testified that he recognized one of the assault victims from an incident that took place at the county building on hood day. Dampeer and "two or three other people from the block" were involved in the altercation with the assault victim, but neither Maxwell nor Walker was present. Investigators reviewed video footage taken at the county building that day, and identified Dampeer with fellow Rollin' 100's member Johnson.

Gray testified that he thought the heavyset man who was pursuing him looked like someone he had seen before at the county building on October 10, 2017. October 10th was Rollin' 100's hood day, and the building was located in their territory. The man had designs related to the Rollin' 100's on his head. He was with a friend and "being ghetto."

The jury was shown a video recording of a traffic stop of a red Nissan on October 28, 2017. Wheeler was the driver, and the

car was stopped in Rollin' 100's territory. Video footage depicted Fuller exiting the front passenger side door. Johnson was adjacent to the car. Wheeler and Johnson had gang-related tattoos.

At a hearing outside the presence of the jury, defense counsel argued that Walker should be permitted to argue third party culpability as a defense to the crimes and that the jury should be instructed regarding that defense. Counsel asserted that the evidence showed Johnson had motive and opportunity to commit the murders. He argued that Johnson was a member of the Rollin' 100's with the moniker Killer Tramp; Johnson was present at the county building on hood day and fought with members of Eight Trey who Dampeer recognized as being among the younger men targeted for murder; Johnson was one of the people detained at the traffic stop with Wheeler; and Johnson had a physical build similar to Walker's. Counsel noted that Walker was not present at the county building on hood day, and that McPherson testified inconsistently regarding the number of people he saw getting into the car and fleeing the murder scene. McPherson initially stated he saw three people leaving the scene rather than two.

Based on this evidence, Walker's counsel proposed the following instruction regarding third party culpability:

"You have heard evidence from defendant Walker that a person other than the defendant committed the offense with which the defendant is charged. Mr. Walker is not required to prove Leodis Johnson's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence

49

that Leodis Johnson committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination.  If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

The prosecution argued that evidence of motive and opportunity were insufficient to raise a reasonable doubt as to guilt absent an actual link between Johnson and the shootings. Additionally, Walker made it clear in his jail call to Hutchins that he and Moore made it look good out there for Hutchins, not Johnson.  The evidence was insufficient to warrant an instruction.

The trial court ruled that it would permit the defense to argue the facts in evidence and any inferences that could be made based on those facts, but refused to instruct the jury on third party culpability, because the theory was not applicable.  The court explained that evidence of more than motive is required— there has to be an actual connection to the crime that was not present in this case.

In closing argument, counsel argued the defense's theory that Johnson was the shooter.

### Analysis

Walker concedes that the trial court permitted him to introduce evidence of third party culpability and allowed him to argue his third party culpability theory based on that evidence and inferences that flowed from it.  He argues that although he

50

was permitted to present and argue the evidence, his statements "lacked the imprimatur that accompanies instructions to the jury," particularly in light of the trial court's instructions to the jury under CALCRIM No. 200 that "[y]ou must follow the law as I explain it to you, even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions," and in light of the court's earlier emphasis of that admonition during voir dire.

Walker's argument suggests that he believes the jury may have disregarded defense counsel's arguments because the jurors would view the arguments as conflicting with the trial court's instructions. We are not persuaded. The trial court instructed the jury on reasonable doubt under CALCRIM No. 220, and stated, "In deciding whether the People have proved their case beyond a reasonable doubt, *you must impartially compare and consider all the evidence that was received throughout the entire trial.* Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty." (Italics added.) These instructions did not conflict with defense counsel's comments that the jury should consider the evidence that tended to show, or at least a raise doubt regarding, whether Johnson was the shooter rather than Walker.

Under the circumstances, the court's refusal to give the third party culpability instruction was harmless under any standard. Walker's proposed instruction simply restated the reasonable doubt standard in connection with the possibility that another might be the guilty party. The omission of this instruction, if error, could not have affected the verdict. It is hardly a difficult concept for the jury to grasp that acquittal is

51

required if there is reasonable doubt as to whether someone else committed the charged crimes.  The closing arguments focused the jury's attention on that point." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.)  " '[B]ecause the reasonable doubt instructions [gave Walker] ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution . . . met its burden of proof,' the failure to instruct on third party culpability was not prejudicial." (*People v. Fayed* (2020) 9 Cal.5th 147, 178.)

### *Prosecutorial Misconduct*

Walker contends that the prosecutor committed misconduct by employing "a dehumanizing analogy as a narrative theme for the events." (Capitalization omitted.)  Specifically, he challenges the prosecutor's use in closing argument of the words "predator" and "prey" to describe gangs. We conclude that Walker failed to preserve this issue for appeal.

### <u>Legal Principles</u>

The " 'prosecutor "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom" ' " but "may not compare a defendant to a beast for the purpose of dehumanizing him [or her] before the jury or in an effort to evoke the jury's racial biases." (*People v. Powell* (2018) 6 Cal.5th 136, 183.)  " 'A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of

persuasion.  [Citation.]  To preserve a misconduct claim for appellate review, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the remark (or conduct) unless such an admonition would not have cured the harm.  [Citation.]  When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion.  [Citation.]'  [Citation.] ' "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*People v. Thompson* (2022) 83 Cal.App.5th 69, 93–94.)

### Proceedings

The prosecutor began her closing remarks to the jury by stating that "in the gang world, there is predator and there is prey."

Walker's counsel objected on the grounds of improper argument.  Counsel did not request an admonition, an instruction, or any other action on the part of the trial court.  The trial court overruled the objection but admonished the jury, "Ladies and gentlemen, this is argument.  This is not evidence."

The prosecutor continued:

"In the gang world, there is predator and there is prey. When Baby Killa got shot . . . the Rollin' Hundreds became the prey. . . . The gang could not let that go not answered. . . . [W]ithin hours of Baby Killer getting shot, the gang, as a unit, as a group, reestablished themselves as the predators.

"It wasn't just one individual.  It was together.

"Who did we have?  We had Keith Walker, Infant Killer, on the phone as soon as that shooting happened, 'Baby Killer just got shot.  Baby Killer got shot.  Infant Trigg got shot.  A lot of homies got shot.  Some homegirls got shot.  Just provide the shit.  We gonna do what we gotta do, just bring some shit.'

"But, it wasn't just Keith Walker who reestablished the gang, the Rollin' Hundreds, as a predator.  It was everybody involved in this case and other people who you've heard about who are not sitting here in the courtroom.  How did they do that?

"They did this by working together, hunting together, seeking out victims because of where they live resulting, ultimately, in the killing and the shooting at of innocent men."

Walker's counsel did not make any further objection to the prosecutor's comments.

Later in argument the prosecutor stated, "We know that's what this whole thing is about.  It was for the benefit of because no shooting of Rollin' Hundreds, especially an original Crip from the hood, Baby Killer, can go unchecked.  This gang cannot remain prey.  They had to reestablish themselves immediately as predators.  They had to immediately reinstill fear, fear among their rivals that they will go to war.  They will not back down.  They will retaliate."

Walker's counsel again did not object.  Rather, counsel addressed the prosecutor's comments extensively in the defense closing argument.  He began, "The prosecutor, for whom I have a lot of respect, apologized for words that other people spoke.  The words she didn't apologize for were her own, and the words that were spoken have become so normalized in our justice system that they just gloss over us as though it's all right.  And it's not all right because the words that were spoken throughout the

54

People's argument are words that 'other-ize' people, that dehumanize people. [¶] When you use the word 'predator,' they even animalize people. That is where our justice system has come off the rails over the last 30 years in Los Angeles in cases about gangs. That's where things have become unhinged and it's wrong and it has to be . . . stood up against . . . . It has to be spoken against."

Defense counsel explained that he did not believe the dehumanization was intentional, but that it was the result of normalization. He asserted that it was important for the jury to step back and recognize that the words predator and prey made the defendants appear "less than fully human." It would be wrong to judge the defendants based on these concepts rather than relying on the facts and the law. Counsel entreated the jurors: "So I insist that everybody in this case be treated as a human being, not as a predator. Not as a label. Not as a gang member."

The prosecutor did not resume the line of argument in her rebuttal.

The next day, after the jury began deliberating, Walker's counsel noted his initial objection to the prosecutor's use of the words "predator" and "prey" on the basis of improper argument. Counsel then requested to augment the record with an objection to the prosecutor's use of "racially coded language," arguing that it amounted to prosecutorial misconduct in violation of the Racial Justice Act. Counsel stated, "It's tantamount to an animalization of the defendants." Counsel did not ask that the court take any specific action. He explained, "I just wanted to memorialize those in the record in the event there is a conviction and appeal."

The prosecutor responded, the "reference to predatory behavior was a reference to the gang Rollin' Hundreds engaging in predatory behavior and preying on innocent victims. It was not a reference to a particular individual. It was not a comparison to an animal or to anything of the sort. It was a comment on the type of behavior that the gang itself was engaging in . . . . [¶] There was certainly no racial motive, racial bias on my part, racial implication. That wasn't intended, and it definitely wasn't what I believe was conveyed."

Walker's counsel acknowledged that the prosecutor's comments were not made in reference to a particular individual.

The trial court stated:

" . . . I don't believe that race was necessarily implicated with regard to the use of those words. I understood them to be applied in the gang context. And there are certainly Black gangs, Hispanic gangs and White gangs who engage in violent behavior. So I don't think this was necessarily a term characterizing any specific racial group as opposed to the gang generally.

"As to the relation to the term predator and prey, the reason I overruled the objection at the time, one, because it was generic or general and not specific to any of the defendants; but, two, based on the specific facts of this case, the court found it [an] applicable analogy in the sense that this was a retaliating— retaliation shooting where the defendants or the gang is alleged to have specifically gone into rival gang territory, seeking out rival gang members in order to shoot in retaliation for the shooting that had happened upon them just 12 hours earlier.

"So in that context, the court felt it wasn't meant as a derogatory term to animalize certainly not the defendants specifically, but not even gang members generally but was very

specific to the facts here of what this particular group is alleged to have done in the entire context, and that's why I overruled it. I wasn't just looking at the terms [themselves]. I was looking at the context of the facts in this case."[16]

### Analysis

We conclude that Walker has forfeited his contention because he did not make a timely objection.[17] "As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) Walker's counsel only objected to the prosecutor's initial statement, and did not object to any of the prosecutor's comments on the ground of prosecutorial misconduct until after the jury had begun deliberating. Moreover, counsel did not request that the court take any action at any point; he indicated that he made the belated objection and claim of misconduct for the purposes of appeal. Counsel's assertion that he wanted to preserve the issue for appeal did not render the

---

[16] Defense counsel later raised the issue of prosecutorial misconduct in his motion for new trial. The court denied the motion for the same reasons.

[17] To the extent that Walker frames his prosecutorial misconduct argument as a violation of the Racial Justice Act, he has forfeited that challenge as well, both because he did not timely and specifically object on that basis, and because the legislation was in effect at the time the prosecutor made her comments and Walker did not move the trial court for a hearing under section 745, former subdivision (b) or otherwise request relief.

objection timely or excuse the fact that he did not request that the court take action. There was ample time to object during argument, and certainly before the jury began deliberating the next day. Counsel appears to have made a tactical decision to address the issue in his own remarks to the jury rather than giving the court an opportunity to correct the alleged impropriety.

### *Sentencing Errors*

Walker contends that the trial court committed several sentencing errors. Because we are reversing the true findings on the gang enhancements (§ 186.22, subd. (b); counts 1–6 & 8) and the active participant in a criminal street gang special circumstance allegations (§ 190.2, subd. (a)(22), counts 1 & 2), we need not address these arguments. Walker will be resentenced regardless of whether the People choose to retry the enhancements and/or allegations. Counsel may raise any concerns regarding the court's sentencing decisions at that time.

Finally, in the response, the People contend that although the jury convicted Walker of murder in count 2, the abstract of judgment does not reflect the murder conviction. Walker does not contest this fact in his briefs. We agree with the People and instruct the trial court to insure that the abstract of judgment properly reflects that the jury found Walker guilty of murder in count 2 when the court resentences Walker.[18]

---

[18] The abstract of judgment properly reflects the enhancements in count 2 and the fact that the sentence in count

# DISPOSITION

We affirm the convictions.  We reverse the true findings on the gang enhancements (Pen. Code, § 186.22, subd. (b); counts 1–6 & 8) and the active participant in a criminal street gang special circumstance allegations (§ 190.2, subd. (a)(22); counts 1 & 2), and remand the matter to the trial court to afford the prosecution an opportunity to retry the enhancements and special circumstance allegations under current law.  Upon resentencing, either after a retrial of enhancements and special circumstance allegations, or after the prosecution elects not to retry any enhancements or special circumstance allegations, the trial court shall insure that the abstract of judgment properly reflects that the jury found Walker guilty of murder in count 2.

NOT TO BE PUBLISHED.

MOOR, J.

We concur:

BAKER, Acting P. J.

KIM, J.

---

two currently carries an indeterminate term of life without the possibility of parole.